Filed 5/29/13  P. v. Gary CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055074 |
| v. | (Super.Ct.No. RIF10000840) |
| DARTAGNAN ANDRE GARY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan, Judge.  Affirmed with directions.

Rodger Paul Curnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

Dartagnan Andre Gary, the defendant, was charged with murder in the shooting

1

death of Jared D., on a street near a house where a party was held. The shooting followed a gang challenge to the Gutta[1] Squad Mafia street gang, of which defendant was an associate. A jury convicted defendant of first degree murder (Pen. Code,[2] § 187, subd. (a)), found that a firearm was discharged, causing death, in the commission of the crime (§ 12022.53, subd. (d)), and the crime was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b).) Defendant was also convicted of a active participation in a criminal street gang. (§ 186.22, subd. (a).) He was sentenced to an aggregate term of 50 years to life and appealed.

On appeal, defendant argues (1) independent review of the record of in camera proceedings pertaining to discovery of information regarding an ongoing investigation is required; (2) his conviction, based upon prior inconsistent statements of witnesses, violated his right of confrontation; (3) his conviction is not supported by substantial

---

[1] The record refers to the group variously as "Gutta Squad Mafia" and "Gutter Squad Mafia." Our research has revealed the existence of a rap group called "Gutta Squad." We also found an entry for "Squad Gutta Boyz" in the Urban Dictionary http://www.urbandictionary.com/define.php?term=squad+gutta+boyz [as of May 31, 2013], which contains the following definition: "A group of wannabee [sic] thugs from Ann Arbor, MI that sell [sic] marijuana, break into cars, rob drunk students and are constantly arrested by the police. They believe they are very clever and 'hard', [sic] however, they often cry like bitches when arrested." Finally, Wiki Answers responds to the question, "What gangs are in Perris, CA?" by listing the Perris Crips and the Gutta Squad Mafia, along with the Perris Locs and the Frontline Perris Locs. (http://wiki.answers.com/Q/What_gangs_are_in_perris_ca [as of May 31, 2013.]) We therefore conclude that the correct spelling of the gang's name is "Gutta."

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

evidence; (4) his due process rights were violated by the admission into evidence of a witness's photographic lineup identification; (5) his trial attorney was ineffective for failing to object to allegedly coerced statements made by a witness who identified defendant as the shooter; (6) reading CALCRIM No. 223 constituted reversible error because it shifted the burden of proof; (7) reading CALCRIM No. 224 misstated the prosecutor's burden of proof and constituted structural error for instructing the jury it must determine whether defendant was innocent as opposed to not guilty; and (8) defendant's sentence on count 2 should be modified to conform with the oral pronouncement. We remand for resentencing on count 2, but otherwise affirm.

## BACKGROUND

Prosecution Evidence

On December 5, 2009, Sean Harper and Shonna Minnifield hosted a party at their residence for Tyshonna Smith, their high-school-aged daughter, on Arrow Creek Drive in the City of Perris, California. Frederick Morehouse came to the residence to drop off his nephew and his ex-girlfriend's brother, but stayed to help search youngsters coming into the house for weapons. The party began at approximately 8:00 p.m. and there was a DJ playing dance music.

Morehouse was outside the house with Sean and Shonna, along with Sean's cousin Lamar Little and Lamar's girlfriend or wife, Catalina. Morehouse marked the hands of attendees who paid a $2 cover charge. People were dancing inside the house. Some members of the Gutta Squad, a street gang in Perris, were present at the party.

3

Jared D., the victim, was the last person to arrive at the party; he came alone in a white car, paid his cover charge, and went inside the house. After a few minutes, Jared came right back out.

At some point, the adults at the party became aware of some yelling down the street. Two or three Black males were on the sidewalk approximately seven houses down, yelling "Fuck Gutta Squad" and "Where you all from?" Sean Harper yelled out that there was none of that going on, that it was a kids' party, and directed party-goers to go inside the house.

Jared D. exited the gate, and shortly afterwards the adults outside heard several gunshots. The adults ran towards the house to make sure everyone was all right when they heard the shots. They made everyone get down and away from the windows. The DJ cut the music everyone waited till they did not hear any more shots. Four people left the party in a gray car after the shots were heard. When the car left, they saw a body in the street. Jared D. had been shot.

Louis Soto, who lived on the same street as the house where the party was held, was on the phone inside his house when he heard the shots and looked out the window. He saw a person standing in the street with what appeared to be a gun in his hand. He also saw two or three people running. The person holding the gun appeared to be African-American and wore a hoodie. At approximately the same time as Louis Soto made his observations, Erasmo Ulloa was driving to his home on Arrow Creek Drive from work. He was stopped at a stop sign at the corner of Arrow Creek Drive and Plum

4

Leaf when he saw four or five kids running in front of him. Because two of them had already run past his car, Ulloa was only able to observe two of the youths, but discerned they were African-American. Subsequently, he saw a body in the street just south of his residence, outside the house where the party had been held.

The police responded to the scene of the shooting within minutes and found the victim nonresponsive. Persons still in attendance at the party were directed not to leave. Police investigators interviewed everyone who was at the party. They learned that the defendant, known to Tyshonna by the nickname "Dro," had been at the party with three or four friends. Defendant had arrived at around 9:00 p.m., but Tyshonna did not see him or his companions after about 11:00 or 11:30 p.m. According to Tyshonna, defendant wore a black hoodie at the party.

Detective Campos was assigned as the co-case agent to investigate the murder of Jared D. He interviewed party goers who were still at the residence and learned that there were guys down the street yelling toward the house at some point before the shooting. He also learned the name of a person called "Dro" from Tyshonna and another party guest. Tyshonna described for Detective Campos what "Dro" was wearing, and mentioned he was wearing a hoodie. Tyshonna told the detective that Laishansie Red was outside and could give him more information.

The day after the shooting, Jerome Williams called Rickey Brown and Raymond Stewart in a three-way call from the jail. In that call, Rickey Brown tells Williams that something happened the previous night, and explains that someone came through "dissin'

5

the hood last night . . . . So one of the little homies got on him and did what he did, and cuz dead."

Detective Campos interviewed Laishansie Red, and then interviewed Houston Stalling at his home on December 21, 2009. Detective Campos learned that Houston Stalling hung out with Gutta Squad, associating with members of that gang. Detective Campos, using a ruse, informed Stalling that he had learned from independent sources that Stalling was seen running down the street with others, although no one had actually revealed this information. Eventually Stalling admitted that he had left the party with three other people, Rudy, Rickey, and Raymond. Stalling also informed Campos that he had heard someone down the street say, "fuck Perris, fuck Naps, fuck Gutta, and fuck PMV."[3]

Detective Campos felt that Stalling was withholding information, so he communicated to Stalling that he was a suspect. Campos was familiar with a person named Clarence Brown, who was known as Rudy, but Clarence Brown was in custody at the time of the shooting. During the interview, Stalling gave different conflicting versions of the events of the night of the shooting. Initially, Stalling said he left the party alone; then he said he left with Rudy, Rickey and Raymond, but that none of them were involved in the shooting; finally, he said that Rudy was the shooter. Stalling was consistent in describing what he and Raymond Stewart were wearing, but he changed the

_____

[3] "PMV" refers to Perris Maravilla, a Hispanic gang.

descriptions of what Rickey and Rudy were wearing. After this interview, Campos wanted to interview the three people mentioned by Stalling: Raymond Steward, Rickey Brown and Rudy.

Detective Campos interviewed Raymond Stewart on December 23, 2009. Stewart informed the detective that after the party, he went to Andre's house and described where Andre lived. Detective Campos went to that location and found Andre's residence on January 12, 2010. The residence was defendant's residence. Detective Campos interviewed defendant at the time and was informed by defendant that he was aware of the shooting but that he was not at the party; instead, he was at his girlfriend Alicia's residence, although three people came to his house after the party: Raymond and two others whom defendant did not know. Campos prodded defendant for the names of the other two individuals, but defendant refused; he informed the detective that he had provided Raymond's name because he had already spoken to Raymond. Defendant also indicated that he formerly associated with Gutta Squad, but that he had stopped.

Detective Campos reinterviewed Houston Stalling on January 12, 2010, at his high school, in order to obtain more information about "Rudy." Campos took an array of photographs, and included defendant's picture based on Stalling's description of Rudy, Tyshonna's statement that defendant was at the party, and Raymond Stewart's statement that they had gone to defendant's house after the party. When he showed the photographs to Stalling, Campos asked Stalling whom he recognized. Stalling pointed to defendant's picture and said he knew defendant from camp.

7

On February 8, 2010, Detective Campos reinterviewed Rickey Brown, known as "Sneak", who had been detained after he was located during a vehicle stop. During this interview, Campos confronted Brown with a statement he had made during a recorded telephone conversation with Jerome Williams, a leader of Gutta Squad, in which Brown stated that "Somebody came through dissing the hood and little homie did what he did."

Rickey Brown's versions of the events changed. First he said that he and "Dro" were walking to the party when someone in a white car yelled out "Perris Locs Crips" and started shooting at the party. Then he said that somebody yelled out "fuck Gutta Squad." Rickey Brown initially told Campos he had gone to the party with his cousin Alicia, but later he said he went to the party with Dro, Houston and Raymond, also known as "Third." Rickey Brown denied that any other Gutta Squad members were present at the party, so he knew the people yelling the challenges were talking to Brown and his group. He then told the detective that the males yelling challenges had guns.

Detective Campos pressed Rickey by explaining that there was a difference between killing somebody and defending oneself, urging Rickey to explain what happened. He asked if any of his group had a gun that night, which Rickey denied. Then Detective Campos asked him, "[W]hat if one of those people told me different?" Later, when Rickey protested that he was being honest, Campos asked him why would Dro tell him something different. When Rickey pressed him about what Dro had said, Campos asked, "[W]hat would you say, if he told me that you shot the boy?" By this time, Campos had heard from two different people that Dro was at the party and suspected

8

there might not be a Rudy.

Rickey Brown was reinterviewed the following day, February 9, 2010. Rickey told investigator Angulo that he did not have anything to do with the crime, but that his "homey" did it. Rickey referred to "YG" as being with them the whole time and, when asked, explained that YG was Dro. Rickey revealed that when the other males yelled "fuck Gutta Squad," he wanted to leave because they were outnumbered, but Dro shot. Rickey and Third (Raymond Steward) ran, Dro came afterwards, and they all went to Dro's house. Rickey Brown indicated that he saw Dro as he shot the boy, and that he (Rickey) found out later that the boy had died. Detective Campos showed Rickey the photographic lineup and asked Rickey if he recognized anybody as the shooter that night. Rickey pointed to the picture in the number 6 position and said, "It was him."

After this interview with Rickey Brown, Detective Campos reinterviewed Houston Stalling on February 10, 2010. Campos informed Stalling that someone had given up a name. He also informed Stalling that he knows there was no Rudy. The detective showed Stalling the same photograph array he had shown Stalling on January 12, 2010, and asked him to identify the shooter, telling him that one of his buddies said he was not going to go down for something that someone else did. Stalling acknowledged that the shooter's photograph was in the lineup. After the detective suggested that if Stalling was being untruthful it was because he had something to hide, Stalling pointed to photograph number 6, Dro. Defendant was subsequently arrested. While in custody, authorities intercepted a letter written by defendant addressed to his father acknowledging his

9

association with a gang.

The gang expert explained that Jerome Williams, also known as "J Roc," was a documented member of Gutta Squad and had been convicted of three gang-predicate crimes. Raymond Stewart was an active, documented member of Gutta Squad, and he went by various monikers, including "Deuce," "Little Red," and "Third." Rickey Brown is an active, documented member of Gutta Squad, and his moniker is "Sneak."

Gutta Squad comprises a group of African-American males with ties to Los Angeles gangs, including 111 Neighborhood Crips, Six Deuce East Coast Crips, and Grape Street Crips. The primary activities of Gutta Squad consist of committing robberies, burglaries, and assaults. The color purple and Colorado Rockies baseball caps are associated with Gutta Squad. In Perris, there are three different Crip gangs: Perris Locs, Neighborhood Perris Crips, and Gutta Squad Mafia. The various Crip offshoot groups do not necessarily get along, but they "squad up" when there are problems with the homegrown Perris gangs.

The gang expert also reviewed a letter defendant had written to his father in which defendant admitted he was "doing this banging stuff" after he "walked on," without getting "put on," as well as field identification cards showing defendant hung out with Gutta Squad members at Copper Creek Park, known as Gutta Squad turf. Based on all the information available, the gang expert opined that defendant was an active member of Gutta Squad.

10

<u>Defense Evidence</u>

Laishansie Red, who knew defendant from school, was at the party. She saw Houston Stalling outside the house with four other males, but she did not see defendant. While outside the house, a white boy came up to the gate in front of the house and asked if anyone from Gutta Squad was there. One of Houston's companions said, "Yeah, we're right here." The white boy then said, "fuck Gutta Squad." Approximately 10 to 12 minutes later, shots were heard.

Frank Rodela, the defense investigator, interviewed Alicia Hymes at her home in Perris. Alicia admitted she had attended the party on December 5, 2009. Alicia stated she saw Rickey Brown but she did not see defendant there. According to Alicia, three days after the shooting, Rickey sent her a text message in which he admitted he shot the boy. Previously, Alicia had said nothing to Rodela about Rickey confessing. Rodela interviewed Laishansie Red, who recognized Raymond Stewart but not from the party, and did not recognize Rickey Brown as being at the party. Rodela also interviewed Houston Stalling who stated he had lied to Detective Campos so the detective would leave him alone.

Defendant's brother, Tykee Hall, and his sister, Tatiana Hall, both testified that defendant was at home all night on the date of the shooting and no one came by. Both siblings had gang ties but denied that defendant was a gang member. Jerome Williams, known as J Roc, formerly dated defendant's sister and enjoyed a leadership role in Gutta Squad. He denied that defendant was a member of Gutta Squad although Jerome had

11

invited him to become a member.  However, since defendant's arrest, Jerome developed a protective relationship towards defendant, who was like a brother.

Criminal Proceedings

Defendant was charged with murder (§ 187, subd. (a), count 1) and with active participation in a criminal street gang.  (§ 186.22, subd. (a).)  In connection with the murder count, it was further alleged that defendant had discharged a firearm causing death (§ 12022.53, subd. (d)), and that the crime was committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b).)  Defendant was tried by a jury and convicted of both counts; the jury also returned true findings on both enhancement allegations. Defendant was sentenced to an aggregated term of 50 years to life (25 years to life for count 1, plus 25 years to life for the gun discharge enhancement; count 2 was stayed pursuant to section 654).  Defendant timely appealed.

## DISCUSSION

**(1)     Review of the Sealed Record of In Camera proceedings**.

Prior to trial, the case was added onto the calendar to resolve discovery issues. The defense informed the court that at the last minute, she received a call regarding additional discovery that the same type of weapon as was used in the murder was discovered on two of the People's witnesses and requested disclosure of the identity of the witnesses.  The People acknowledged that two prosecution witnesses were suspects in a crime where a firearm was discharged, but did not disclose the names of the suspects to the defense.  The prosecutor requested an in camera hearing to disclose to the court what

12

she knew because of the ongoing investigation.  The court conducted an in camera hearing and sealed the record.  Afterwards, the court indicated there was no relevant information to be turned over to the defense.

On appeal, defendant argues that we should independently review the sealed transcript of the in camera proceedings to determine if the trial court's ruling was correct.  The People do not oppose the request.  We have reviewed the sealed reporter's transcript of the in camera hearing and found nothing discoverable.

**(2)     The Introduction of Prior Inconsistent Statements Did Not Violate Defendant's Sixth Amendment Right of Confrontation.**

During defendant's trial, several witnesses, most of whom were members of the street gang, Gutta Squad Mafia, testified in a manner that was inconsistent with prior statements made to law enforcement investigators.  As a consequence, the People proffered evidence of the prior inconsistent statements, as well as other evidence pointing to defendant's guilt.  Defendant argues his conviction must be reversed because it was entirely based on out-of-court statements, in violation of his Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process of law.  We disagree.

We agree that both the Constitution of the United States and the California Constitution guarantee a criminal defendant the right to confront the witnesses against him.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  The right of confrontation is not absolute, however, and in appropriate cases must bow to other legitimate interests in the criminal trial process.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1172, and cases

13

therein cited.)  The Confrontation Clause guarantees only """"an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."""  (*United States v. Owens* (1988) 484 U.S. 554, 559 [108 S.Ct. 838, 98 L.Ed.2d 951].)

The opportunity to confront and cross-examine is not denied when a witness testifies to his current belief but is unable to recollect the reason for that belief. (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [106 S.Ct. 292, 88 L.Ed.2d 15].)  The opportunity is not denied when a witness feigns forgetfulness and is impeached with her statements to police.  (*People v. Homick* (2012) 55 Cal.4th 816, 861; see also *People v. Perez* (2000) 82 Cal.App.4th 760, 766.)

Evidence Code section 1235 expressly authorizes the admission of prior inconsistent statements to impeach a witness's testimony during an evidentiary hearing. Such statements are also admissible to prove the truth of the matters asserted therein. (*People v. Green* (1971) 3 Cal.3d 981, 985.)  The Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.  (*California v. Green* (1970) 399 U.S. 149, 158, 161 [90 S.Ct. 1930, 26 L.Ed.2d 489].)

Defendant relies on *In re Miguel L.* (1982) 32 Cal.3d 100, which reversed a conviction for burglary where the conviction was based solely on recanted out-of-court statements by his accomplice.  In *Miguel L.,* the repudiated statement was one made by an accomplice, and the court's decision rested on the holdings of *People v. Gould* (1960)

14

54 Cal.2d 621, 631, and *In re Johnny G.* (1979) 25 Cal.3d 543, 547-548. *Gould* had held that an extrajudicial identification that cannot be confirmed by an identification at trial is insufficient to sustain a conviction in the absence of other evidence connecting the defendant with the crime. (*Gould,* at p. 631.)

In *Miguel L.,* the court acknowledged that a conviction may stand if the extrajudicial statement was reiterated by the witness under oath at a preliminary examination or other judicial proceeding, and there was evidence from which the factfinder could credit the witness's prior testimony over his or her failure to confirm the extrajudicial statements at trial. (*In re Miguel L., supra,* 32 Cal.3d at p. 106.) However, the court followed the reasoning of *Gould,* adding that under section 1111, a conviction may not be based solely on the uncorroborated testimony or statements of an accomplice. (*Id.* at p. 109.)

*Gould,* which required in-court corroboration of an out-of-court identification, was overruled in *People v. Cuevas* (1995) 12 Cal.4th 252, 257, 274-275, holding that the sufficiency of an out-of-court identification to support a conviction was to be judged by the substantial evidence test. Subsequently, in *People v. Williams* (1997) 16 Cal.4th 153, 248, the California Supreme Court extended *Cuevas* to out-of-court statements by an accomplice, questioning the continued validity of *Miguel L.,* on the issue of whether an accomplice's extrajudicial statements were insufficient to prove that the defendant committed the crime.

Defendant does not contend that his conviction was improperly grounded on the

15

testimony of accomplices and lacked independent corroboration, within the meaning of section 1111. His own out-of-court statements showing he attempted to suborn perjury would provide independent corroboration of any accomplice testimony in such a circumstance.

Instead, his argument is that the admission of prior inconsistent statements of certain witnesses violated his confrontation rights and rendered his trial unfair. Given the abundance of decisional authority by the United States Supreme Court and the California Supreme Court, which have expressly held that the admission of prior inconsistent statements does not violate a defendant's confrontation rights, we conclude the conviction was constitutionally proper.

(3)     **Defendant's Conviction Is Supported By Substantial Evidence**.

In a related argument, defendant argues the conviction must be reversed because the prior inconsistent statements do not constitute solid evidence. We disagree.

In reviewing a sufficiency of evidence claim, our role is limited; we determine whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonable deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Mason* (2006) 140 Cal.App.4th

16

1190, 1199.)

Substantial evidence must be of ponderable legal significance, reasonable in nature, credible and of solid value. (*People v. Concha* (2008) 160 Cal.App.4th 1441, 1451.) While we must ensure that the evidence is reasonable, credible and of solid value, it is the exclusive province of the judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. (*People v. Smith, supra,* 37 Cal.4th at p. 739.) On review, we do not reevaluate the credibility of witnesses or resolve factual conflicts; rather, we presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence. (*People v. Booker* (2011) 51 Cal.4th 141, 173, citing *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

We conclude there was substantial evidence to support the verdict. Notwithstanding the admission of prior inconsistent statements of defendant's gang associates as substantive evidence, there was other evidence pointing to his guilt. For instance, defendant requested that his mother communicate to his girlfriend that she should ask the girl who hosted the party to say he was not in attendance. The jury was permitted to draw an inference of guilt from this statement. (CALCRIM No. 371; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.) Other evidence, completely independent of the testimony of defendant's fellow gang members, placed him at the

17

party at the time of the shooting and provided a motive for the shooting.[4]

The jury could reasonably consider the prior inconsistent statements along with the other evidence and conclude that defendant shot the victim.  There is substantial evidence to support the verdict.

(4)     **Defendant's Due Process Rights Were Not Violated b the Admission of Stalling's Identification of Him From the Photographic Lineup**.

Defendant contends that the trial court erroneously admitted evidence that Houston Stalling picked his photograph from a photographic lineup because the lineup was unduly suggestive.  He points to the fact that Stalling was shown more than one photographic lineup, that defendant's photograph was included in both, and that Stalling testified he felt pressured to identify defendant.  We disagree.

Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 123.)  Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.  (*Simmons v. United States* (1968) 390 U.S. 377, 384 [88 S.Ct. 967, 19 L.Ed.2d 1247].)  The defendant has the initial burden of establishing that

_____

[4]  In his letter to his father, defendant stated he was getting shot at by Perris Locs, PMV, South Side Mafia, and Sex Cash.

the pretrial identification was suggestive.  (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 38; *People v. Cooks* (1983) 141 Cal.App.3d 224, 305.)  Defendant must show "unfairness as a demonstrable reality, not just speculation."  (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

A procedure is unfair if it suggests, in advance of the identification by the witness, the identity of the person suspected by the police.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1164.)  Whether the identification technique employed in a given case violates due process of law depends on the totality of the circumstances surrounding it.  (*Stovall v. Denno* (1967) 388 U.S. 293, 301-302 [87 S.Ct. 1967, 18 L.Ed.2d 1199]; *People v. Arias* (1996) 13 Cal.4th 92, 168.)  However, there is no requirement that a defendant in a lineup, either in person or by photograph, be surrounded by others nearly identical in appearance.  (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052, citing *People v. Wimberly* (1992) 5 Cal.App.4th 773, 790.)  Nor is the validity of a photographic lineup considered unconstitutional simply because one suspect's photograph is more distinguishable from the others in the lineup.  (*Brandon,* at p. 1052, citing *People v. Johnson* (1992) 3 Cal.4th 1183, 1215-1218.)

Frequently, claims of suggestiveness involve a photo spread where the characteristics of the photograph of the defendant are such that attention is immediately drawn to that photograph.  For instance, a six-man lineup consisting of only one Oriental, the defendant, would be suggestive, as would a lineup including only one black-haired person among light-haired persons, or a tall defendant among short men, or a youthful

19

defendant in a lineup with men over 40 years of age. (See *United States v. Wade* (1967) 388 U.S. 218, 232 [87 S.Ct. 1926, 18 L.Ed.2d 1149].)

Even where the procedure is determined to be suggestive, the identification may still be found to be reliable under the totality of circumstances. (*People v. Nguyen, supra,* 23 Cal.App.4th at p. 39; *People v. Contreras* (1993) 17 Cal.App.4th 813, 820.) Once it is established that an identification procedure used was unnecessarily suggestive, exclusion of identification testimony is required only if the suggestive identification procedures tainted the in-court identification. (*People v. Yeoman, supra,* 31 Cal.4th at p. 123.) Showing photographs of the defendant in separate lineups conducted at different times does not necessarily render the lineup procedure unduly suggestive. (*Id.* at pp. 124-125.)

The question is not whether there were differences between the lineup participants, but whether anything caused the defendant to stand out from the others in a way that would suggest the witness should select him. (*People v. Avila* (2009) 46 Cal.4th 680, 698.) We independently review the trial court's ruling that the pretrial identification procedure was not unduly suggestive. (*Id.* at pp. 698-699.)

Defendant does not point to any particular characteristic of the photographs of other participants in the photographic lineup, or the photograph of the defendant, that made the lineup impermissibly suggestive. Nor does defendant point to any characteristic of the photographs that would draw attention to his photograph. Instead, he argues that the defendant's photograph was the only photograph that was included in each of the different photo arrays, and that the officers pressured or badgered Stalling

20

into making an identification. However, while the officers attempted to garner Stalling's cooperation and honesty after Stalling attempted to mislead them in the investigation, the conduct of the detective did nothing to communicate that the photograph of the defendant was the suspect, aside from the fact that defendant's photograph was included in the separate arrays, shown to Stalling on separate occasions, a month apart.

None of the authorities cited by defendant holds that showing a defendant's photograph in different arrays, without more to suggest that the defendant is the suspect, is unduly suggestive. Further, where the witness does not identify the defendant in court as the person who did the shooting, the photographs could not have tainted the later in-court identification. (See *People v. Alexander* (2010) 49 Cal.4th 846, 902.)

In the present case, Stalling was interviewed four times and was first shown a photographic lineup in which defendant's photograph was included during the third interview. When asked if he recognized anyone, Stalling indicated he recognized defendant from camp, but denied defendant was at the party. A month later, Stalling was interviewed for the fourth time, on February 10, 2010. During this interview, the detective confronted Stalling with his false statement attributing the shooting to a person named Rudy. Stalling was shown another photographic lineup containing a photograph of defendant and Stalling acknowledged that the shooter was in the lineup, but refused to say which person it was. When the detective went through each photograph individually, asking if that person was the shooter, Stalling finally agreed that the sixth photograph, the picture of the defendant, was that of the shooter.

21

There was nothing inherently suggestive about showing a witness two separate photographic lineups containing defendant's photograph, a month apart. Further, there is little likelihood that the photographic lineup procedure tainted the identification because the witness was well acquainted with the defendant and could have identified him without the aid of a photographic lineup. Fearful of being labeled a "snitch," there was greater risk that Stalling would point to one of the other photographs in order to throw suspicion away from his fellow gang member.

The policy of excluding identifications made from suggestive lineups is to prevent misidentification at trial. Although there is no requirement that the witness making the identification be an unknown stranger to the defendant, as defendant argues, there is less risk of "irreparable misidentification" where the witness is acquainted with the defendant prior to viewing the lineup and refuses to identify him at trial. Given that the defendant had the burden of showing that it was the photographic lineup procedures that led to Stalling's selection of his photograph as that of the shooter, as opposed to Stalling's familiarity with defendant and knowledge of defendant's participation in the crime, he has not met that burden here. Instead, the real issue is not whether the lineup procedure itself was suggestive, but whether Stalling's statement that the defendant was the shooter was involuntary, as the product of badgering and pressure by the detectives, which we address separately, *post*.

(5)     **Defendant's Trial Counsel's Failure to Object to the Allegedly Coerced Statements Made by a Witness, Identifying Defendant As the Shooter, Was Reasonable**.

Defendant asserts he was "victimized" by his trial counsel's failure to object or move to exclude the extra-judicial identification by Rickey Brown of defendant as the shooter, which he asserts constituted ineffective representation of counsel.  He argues he had standing to challenge the admission of coerced statements made by third parties and that his counsel was ineffective for failing to object to Rickey Brown's statement that "it was Dro," and Houston Stalling's identification of defendant's photograph in the photographic lineup, identifying defendant as the shooter.[5]  We disagree.

To demonstrate that his right to effective assistance of counsel was violated, defendant must satisfy a two-pronged test:  He must show (1) performance below an objective standard of reasonableness by his attorney, and (2) prejudice sufficient to establish a reasonable probability he would have obtained a more favorable result in the absence of counsel's error.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [104 S.Ct. 2052, 80 L.Ed.2d 674].)  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)  Tactical decisions are generally not deemed

---

[5]  Defendant also raises this issue in a companion petition for writ of habeas corpus, case No. E056530, which we deny by a separate order.

23

reversible, and counsel's tactical decisions must be evaluated in the context of all the available facts. (*Strickland,* at p. 690.)

The failure to object to the admissibility of evidence is normally considered a matter of trial tactics. (*People v. Majors* (1998) 18 Cal.4th 385, 403; *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1131.) Where there is no sound basis for an objection, counsel's failure to object cannot establish ineffective assistance of counsel. (*People v. Lewis* (2001) 26 Cal.4th 334, 359.)

Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion. (*People v. Williams* (2010) 49 Cal.4th 405, 452.) In fact, defendants generally lack standing to complain that a police interrogation violated a third party witness's Fifth Amendment privilege against self-incrimination, or Sixth Amendment right to counsel, nor may a defendant complain that law enforcement officers violated a third party witness's Fourth Amendment rights. (*Williams,* at p. 452, citing *People v. Badgett* (1995) 10 Cal.4th 330, 343.)

A defendant may assert a violation of his or her own rights to due process of law and fair trial based upon third party witness coercion; however, the rule refers to situations in which the defendant can establish that *trial* evidence was coerced or rendered by the prior coercion and that admission of this evidence would deprive the defendant of a fair trial. (*People v. Williams, supra,* 49 Cal.4th at pp. 452-453, citing

24

*People v. Jenkins* (2000) 22 Cal.4th 900, 966, 969; *People v. Badgett, supra,* 10 Cal.4th at pp. 347, 348.)

At trial, neither Stalling nor Brown inculpated the defendant, so defendant's due process rights at trial were not violated by inculpatory testimony induced by prior coercion. Nevertheless, we examine the asserted coercion of each third party witness separately to determine whether defense counsel's failure to object to admission of involuntary statements of a witness to impeach that witness at trial implicated defendant's right to a fair trial.

### a.    *Stalling's Identification of Defendant*

The argument that Stalling's identification of defendant as the shooter is made without any authority or analysis of the conduct of the officers during the interview. We assume defendant intended to refer to conduct described in his previous argument, regarding the admissibility of Stalling's identification. However, defendant has not sufficiently established that Stalling was coerced, by improper interrogation methods, to identify defendant as the shooter. At most, we discern that Stalling was dishonest in his earlier interviews, identifying a fictional person named "Rudy" as the shooter, causing detectives to reinterview him in an effort to uncover the truth.

A photographic lineup was shown to Stalling at the third interview, where Stalling implicated a person named "Rudy," who later turned out to be fictional. Defendant's photograph was included in this array because investigation had revealed that defendant was present at the party with three other Gutta Squad members, including Stalling. A

25

fourth interview was conducted after the investigators realized there was no "Rudy." Defendant's photograph was included again, because he was known to have attended the party (through Tyshonna's pretrial statement) and to be a member of Gutta Squad, leading officers to suspect he was the person Stalling had referred to as "Rudy." Campos was aware that the real "Rudy," who was a member of Gutta Squad, was incarcerated on the date of the shooting.

It was Stalling's own dishonesty which led to the successive interviews after the falsehoods were discovered. Confronting a witness with his false statements in an attempt to solve a murder is not "coercion." Nor did counsel fail to object to the admission of the identification evidence, as it was the subject of an in limine motion. Further, because Stalling had a failure of recollection at trial, his prior inconsistent statements were admissible as impeachment. (Evid. Code, § 1235.) Even statements made by a defendant, obtained in violation of the *Miranda* are admissible against him as impeachment. (*Harris v. New York* (1971) 401 U.S. 222, 225-226 [91 S.Ct. 643, 28 L.Ed.2d 1].)

The *Williams* rule permits a defendant to assert a violation of his or her own right to due process of law and a fair trial based upon third party witness coercion if the defendant can establish that the trial evidence was coerced or rendered unreliable by prior coercion. (*People v. Williams, supra,* 49 Cal.4th at pp. 452-453.) The burden rests upon the defendant to demonstrate how the earlier coercion directly "'impaired the reliability of the testimony.'" (*Id.* at p. 453, quoting *People v. Badgett, supra,* 10 Cal.4th at p. 348.)

26

Defendant does not argue that Stalling's out-of-court statements, made during interviews with detectives, directly impaired the reliability of his in-court testimony.

There was no basis upon which competent counsel could have objected to the admission of the extra-judicial identification, particularly where it was offered as impeachment (prior inconsistent statement) when Stalling, who was granted immunity, testified that he did not recall defendant being at the party.

b.      *Rickey Brown's Statement that "It Was Dro"*

Defendant's argument respecting the failure to object to Rickey Brown's extrajudicial statements points to several circumstances.  First, after Rickey Brown was admonished for his interrogation, he was told that defendant had fingered him as the shooter in order to elicit information about the shooting.  Defendant acknowledges there was nothing improper about that.  He points to the detective's statements, admonishing Rickey that as a member of the group of which the shooter was a part, he could be held responsible for murder, unless Rickey explained the circumstances of the shooting.  On more than one occasion, the detective gave Rickey an opportunity to provide mitigating information to avoid prison.  Detective Campos frankly informed Rickey he was being detained as a suspect in the crime.

Eventually, Rickey asked why he was being asked questions as if he had done something, and Campos reminded Rickey that the group he was with did something wrong.  Campos gave Rickey some time to think and left the interview room to get a cigarette for Rickey.  When the interrogation resumed, Campos reminded Rickey that he

27

knew it was one of the four members of his group.  He told Rickey, "It's your life, man. You . . . need to think about you."  At that point, Rickey asked to call his mother so she could call a lawyer.  However, rather than discontinue the questioning, Campos continued his questions, eventually eliciting Rickey's statement that, "It was him," while pointing to Dro's (defendant's) photograph.

Defendant asserts that the continued questioning after Rickey made the request to contact his mother, violated Rickey's rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].)  Rickey had previously waived his right to remain silent and agreed to speak with the detective.  Of course, a suspect may revoke his *Miranda* waiver if he unambiguously asserts his right to silence before questioning ceases.  (*People v. Martinez* (2010) 47 Cal.4th 911, 948, citing *People v. Stitely* (2005) 35 Cal.4th 514, 535; *People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  Assuming Rickey intended to revoke his waivers, his request to speak to his mother did not unambiguously require the cessation of an interrogation.  (*People v. Nelson* (2012) 53 Cal.4th 367, 383.)  However, Rickey's reference to his mother contacting an attorney may constitute an ambiguous request for counsel which Campos should have clarified.  (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217, citing *People v. Farnam* (2002) 28 Cal.4th 107, 181.)  The detective should have attempted to clarify whether Rickey intended to assert his right to remain silent at that point.

As to the question of whether Rickey's statements were the product of coercive police conduct, we observe that courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable. (*People v. Williams, supra,* 49 Cal.4th at p. 436, quoting *People v. Smith* (2007) 40 Cal.4th 483, 501.) Police deception does not necessarily invalidate an incriminating statement. (*Id.* at p. 505.) Courts have found no improper police coercion where an officer falsely tells a suspect that his accomplice has been captured and confessed (*Frazier v. Cupp* (1969) 394 U.S. 731, 739 [89 S.Ct. 1420, 22 L.Ed.2d 684]), where the officer implied he could prove more than he actually could (*People v. Jones* (1998) 17 Cal.4th 279, 299), or where officers repeatedly lied, insisting they had evidence linking the suspect to a homicide. (*People v. Thompson* (1990) 50 Cal.3d 134, 167.)

Here, the tactics employed by the detectives were no more coercive than the examples provided above which courts have found do not invalidate an incriminating statement. Thus, even assuming that Rickey's reference to his mother contacting an attorney constituted an invocation of his *Miranda* rights, the statements made to the detective were properly admissible for impeachment purposes. (*Harris v. New York, supra,* 401 U.S. at p. 224; *People v. Peevy* (1998) 17 Cal.4th 1184, 1191-1202.)

Competent counsel, aware of such holdings, would realize that an objection would be futile, and would reasonably decide not to object. There was no ineffective assistance of counsel.

29

**(6)    CALCRIM No. 223 Does Not Shift the Burden of Proof.**

Defendant argues that the court committed reversible error by reading CALCRIM No. 223 to the jury. He asserts that this instruction shifted the burden of proof and undermined the presumption innocence by informing the jury that direct and circumstantial evidence are acceptable types of evidence to prove or disprove elements of a charge. Defendant argues that his language implied that the defendant was required to disprove the charge, in violation of his due process rights. We disagree.

CALCRIM No. 223 does not mention the burden of proof, which was addressed in a separate instruction. (See CALCRIM No. 220, which told the jury the presumption of innocence requires the prosecution to prove the defendant guilty beyond a reasonable doubt.) Nor does it state that a defendant must prove or disprove anything. "Reasonably read, the instruction cautions only that neither direct nor circumstantial evidence should be accorded greater weight simply because it is direct or circumstantial evidence." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 930.) As such, it does not "undermine the reasonable doubt standard or presumption of innocence." (*People v. Smith* (2008) 168 Cal.App.4th 7, 18, citing *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1186-1187; *Anderson,* at pp. 931-934; see also *People v. Golde* (2008) 163 Cal.App.4th 101, 117-118.)

Defendant has failed to sustain his burden of establishing that the language of CALCRIM No. 233 shifts the burden of proof.

30

**(7)     CALCRIM No. 224 Does Not Misstate the Prosecutor's Burden of Proof.**

In a separate argument, defendant argues that CALCRIM No. 224 instructed the jury to determine whether defendant was innocent rather than not guilty, misstated the prosecution's burden of proof and constituted structural error. He also argues that there is a conflict between CALCRIM Nos. 220 and 224. We disagree.

Defendant's arguments fail to cite any of the published cases which have affirmed the constitutional correctness of the instructions. His arguments have been rejected on multiple occasions. (*People v. Ibarra, supra,* 156 Cal.App.4th at pp. 186-187; *People v. Anderson, supra,* 152 Cal.App.4th at pp. 931-934; see also *People v. Smith, supra*, 168 Cal.App.4th at p. 18.) We agree with the conclusions of these authorities and do not find any discussion of former CALJIC instructions to be helpful.

**(8)     Defendant Must Be Resentenced on Count 2 Where the Court's Intention Is Unclear from the Record**.

At sentencing, the court imposed a term of 25 years to life for count 1. Referring to the enhancements to count 1, the court stated "As to the 186.22(b)(5) allegation, along with the 12022.53(d) allegation having been found true, that shall add an additional 25 years to life, for a total sentence of 50 years to life."[6] As to count 2, the court stated, "I

---

[6] The term for a gang enhancement alleged in connection with a violent felony (§ 667.5, subd. (c)), is a term for life, from which the offender shall not be paroled until a minimum of 15 calendar years has been served. (§ 186.22, subd. (b)(5).) As such, there is no separate enhancement for the gang allegation, which merely establishes the

*[footnote continued on next page]*

shall choose the preferred mid term of 3 years in state prison." The court then stayed the term for count 2 pursuant to section 654. On appeal, defendant argues that the court intended to impose a sentence of two years for count 2, since that is the midterm. Respondent disagrees because the abstract reflects the three-year term orally pronounced by the court.

Where sentencing error involves the failure to state reasons for making a particular sentencing choice, including the imposition of consecutive terms, reviewing courts have declined to remand cases where doing so would be an idle act that exalts form over substance because it is not reasonably probable that the court would impose a different sentence. (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889.) However, resentencing is appropriate where the trial court's intention is not clear from the record, to allow it to clarify its intention. (See *People v. Jackson* (1985) 171 Cal.App.3d 609, 616-617; see also *People v. Gamble* (2008) 164 Cal.App.4th 891, 901 [record did not disclose whether trial court would have exercised its discretion to impose a concurrent term for one count if it had known it had such discretion, requiring remand].)

We cannot say with certitude whether the court intended to impose the middle term (two years), or whether it intended to impose the three-year term it orally imposed. We therefore remand for clarification.

---

*[footnote continued from previous page]*
minimum parole eligibility period to the indeterminate life term. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007-1011; *People v. Sok* (2010) 181 Cal.App.4th 88, 94.)

## DISPOSITION

The convictions are affirmed.  The matter is remanded for resentencing on count 2, and in all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____

P J.

We concur:

McKINSTER_____

J.

CODRINGTON_____

J.